JOHN W. HUBER, United States Attorney (#7226)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
JAMIE Z. THOMAS, Assistant United States Attorney (#9420)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 • Salt Lake City, Utah 84111
Telephone: (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT GLEN MOURITSEN,<br><br>Defendant. | Case No. 1:18-cr-00075 TC<br><br>GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING FACTORS<br><br>Judge Tena Campbell |

Robert Glen Mouritsen is the quintessential wolf in sheep's clothing.  Outwardly, he presents himself as a loving husband, caring father, trustworthy friend, and devoted member and former Stake President of the Church of Jesus Christ of Latter-day Saints.  In reality, he is a manipulator, a thief, and a liar who uses his "righteousness" as currency and preys on the goodwill of his trusting friends and associates.  He repeatedly, and for years, lied to his 13 identified victims to steal $2,411,463.54.  He lied to the FBI when asked what he did with investor money.  Mouritsen's true colors have been on full display for this Court post-indictment:  He violated his release conditions by speaking and giving false assurances to one of his victims, and he sought to avoid trial by misleading this Court about his health by having his son-in-law Ryan Stewart write him a doctor's note stating that he had to avoid all physical and emotional stress.[1]   Given his long

---

[1] These claims were *directly* refuted by Mouritsen's cardiologist and CT surgeon.

history of anti-social, sociopathic behavior, the United States has legitimate concerns for the financial safety and well-being of any community in which Mouritsen lives.   For these reasons, the United States recommends a 12-month term of imprisonment as specified in the plea agreement.   The United States also recommends the Court order restitution in the amount of $2,411,463.54.

## I.   FACTUAL BACKGROUND

From at least 2006 (and probably earlier) to August 2018, defendant Mouritsen solicited his family, friends, neighbors, and fellow church members to invest their money to further a venture he called "The Project."   Mouritsen represented to his victims that "The Project" involved a series of complicated international transactions that would replace fiat money (legal tender by government decree) with an asset-backed currency system—for example, the U.S. dollar tied to the value of a commodity like gold.   Despite the fact that "The Project" failed to succeed for years and years, Mouritsen continued to raise money and promise significant annual returns.

On January 8, 2018, agents with the FBI and IRS-CI contacted Mouritsen at his residence and asked him directly what he did with the investment money.   Mouritsen stated that he _never_ used it for himself, but that "100%" of investor money went overseas to fund "The Project".   Later that month, on January 23, 2018, Mouritsen was interviewed by agents again.   He was confronted with his bank accounts and evidence showing that he spent investor money on himself and that 0% of investor money went overseas.   Mouritsen's first response was, "Don't you need a warrant to look at my accounts?"   Then Mouritsen stated, "I am The Project."   He explained to federal agents that because his entire life is dedicated to "The Project", all the money he spends on himself (like paying off his credit cards, going on vacation, etc), furthers "The Project".

## II.   GUIDELINE CALCULATION BY THE UNITED STATES

The United States calculates the defendant's guidelines as follows:

Count 1: 18 U.S.C. § 1343 (Wire Fraud):

| | | |
|---|---|---|
| § 2B1.1(a)(1) | Base Offense Level | +7 |
| § 2B1.1(b)(1)(I) | Loss amount: <$1.5M | +16 |
| § 2B1.1(b)(2)(A) | Substantial Hardship | +2 |
| § 3B1.3 | Abuse of Trust | +2 |
| § 3E1.1(a)-(b) | Acceptance | -3 |

Total Offense Level = 24
Criminal History Category I = <u>51 to 63 Months</u>

## III.   18 U.S.C. § 3553 FACTORS SUPPORTING THE UNITED STATES' RECOMMENDATION

The § 3553 factors the Court is to consider in imposing a particular sentence support the United States' recommendation of 12 months incarceration:

*1.   Nature and circumstances of the offense*:

Mouritsen often used religion as a means whereby to accomplish his fraud.   For example, victim H.G. reported that Mouritsen's honesty is beyond reproach because they had knelt in prayer together often and Mouritsen's knowledge of "the gospel and church history" is extensive. Another victim, D.R. reported that he knew his money was safe because he had special "ecclesiastical" trust in Mouritsen because they had shared special spiritual experiences together: "We've prayed together. We've made decisions together…. you can't receive the spirit of the Lord unless you're worthy."   This victim's wife provided the following statement to the United States: "I have a husband who I love and I trust, we've been married almost 40 years, and he feels strongly about this project.   So my faith is in my husband."   Based on his misrepresentations and his use of religion, approximately 13 people invested with Mouritsen a total of approximately $2,411,463.54.

Mouritsen has no criminal history, but his fraud spans as far back as bank records go (over

10 years).  Mouritsen's crime took place by phone, email, text, and face to face.  He looked into the eyes of his friends and lied to steal their money and lied to keep their money.  He did this day after day, week after week, year after year.  His fraud took sustained effort, deliberation, deception, and planning.

Most people guided by conscience find it impossible to understand how someone like Mouritsen would financially betray a dear friend through religious manipulation.  Mouritsen preyed on this blind spot and like most confidence men, he deployed his prodigious ability to persuade people to believe in his multitude of deceptions.  To this day, there are a group of educated and intelligent individuals who—despite Mouritsen's indictment and guilty plea—still believe that he will someday, somehow realize the success of "The Project".  Despite all that has happened, they continue to doubt their own sense of reality and instead choose to believe in Mouritsen and his ability to somehow replace the currency system of the United States.

In imposing sentence, the Court should consider the devastation caused by Mouritsen's scheme.  Many of Mr. Mouritsen's victims have their own personal family challenges similar to the challenges faced by the Mouritsen's in raising a child with severe disabilities.  All combined, his victims have lost millions of dollars—money that should have been dedicated to life's various particulars and worthwhile endeavors.

2.  *History and characteristics of the defendant*:

Many of Mouritsen's criminal counterparts who steal much less through bank robberies or store thefts commit such crimes because of drug addiction, desperate indigence, or traumatic childhoods.  Mouritsen, a defendant who does not face any of these inequities, is qualitatively more culpable than his counterparts, and he should receive a sentence reflective of that culpability.

3.  *The need for the sentence (A) to reflect the seriousness of the offense, to promote respect for*

*the law, and to provide just punishment for the offense; (B) to afford adequate deterrence;
(C) to protect the public from further crimes of the defendant; and (D) to provide defendant
with appropriate vocational training, medical care, or other correctional treatment in the
most effective manner*:

The recommended sentence of 12 months reflects the seriousness of the offense, provides just punishment, promotes respect for the law, and affords adequate deterrence (both specific and general) while at the same time recognizing Mouritsen's guilty plea.   Part of a just punishment is to leave no doubt in the mind of the defendant, the victims, and third-party observers that the Court has fully considered the gravity of the criminal conduct, and reacted accordingly.

*Specific Deterrence*:   Based on the extensiveness of the fraud, his statements to the Court, his behavior while on release, his continued delusional belief that "The Project" will succeed, and the fact that some victims continue to believe in him, the United States submits that Mouritsen is at a very high risk for recidivism.   If his behavior while on pretrial release is any indication of how he will behave on supervised release post-sentencing, Mouritsen will seek to advance his own self-interests using other people's money.   He is uninterested in making an honest living through actual work.

*General Deterrence*:   As this Court is aware, the state of Utah is known for being a hotbed of rampant fraud and white collar crime.[2]   Salt Lake City has been named by the Wall Street Journal as the "Fraud Capital of America."[3]   Utah has suffered "a tsunami of Ponzi operations, pyramid schemes, mortgage and bank fraud and other financial crimes that helped propel Utah to

---

[2] THE ECONOMIST, *Affinity Fraud, Fleecing the flock: The big business of swindling people who trust you*, January 28, 2012 ("The state thought to have the most affinity fraud per head is Utah. . . ."); Byline: In Our Opinion for the Deseret News, *Fraud Registry*, DESERET MORNING NEWS, May 19, 2015 ("The new fraud registry is unique in the country, but so is the prominence of such crime in our community."); Janice Peterson, *Investment fraud rampant in Utah County*, DAILY HERALD, Feb. 28, 2010.
[3] Robert Brazell, *Shyster Extraordinaire*, DEEP CAPTURE, Dec. 29, 2015.

infamous heights nationally."[4]   It has been reported that the loss figures in Utah fraud cases exceed many cases out of large metropolitan areas.[5]   Such crime affects not just immediate victims, but generations of victims.   Fraudsters often find success in Utah because "they appear to be good and honest people with an outgoing, attractive personality."[6]   It is estimated that white-collar scams have cost thousands of Utah victims billions of dollars in recent years.[7]   The FBI has recently ranked Utah as one of the top five states for white-collar fraud in America.[8]   Utah is the only state with a dedicated regional Securities Exchange Commission office that services no other location.   Utah's fraud epidemic has reached such significant proportions, state lawmakers recently approved the nation's first-ever white collar crime offender registry to include photos, names and aliases of Utah State's fraudsters.[9]

Section 3553(a)(2)(B) requires the Court to impose a sentence that "affords adequate deterrence to criminal conduct."   When Congress enacted Section 3553(a), it noted the importance of general deterrence and specifically sought to curb judicial leniency in the context of economic crimes: "Major white collar criminals often are sentenced to small fines and little or no imprisonment.   Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."[10]   This same goal is also

---

[4] Tom Harvey, *FBI agent has seen Utah through flood of fraud*, THE SALT LAKE TRIBUNE, June 24, 2012.

[5] *Id.* (quoting FBI S.A. James Malpede) ("The amount of fraud is so great that the FBI in Utah largely concentrates only on cases involving investments of $10 million or more.")

[6] *Id.*

[7] Eric S. Peterson, *Uncle Scam*, SALT LAKE CITY WEEKLY, Dec. 9, 2010 ("In June, state and federal investigators announced that Utahns may have lost as much as $1.4 billion in fraud in 2009.   'Utah is supposedly the fraud capital, and that's our urban folklore,' [Salt Lake County Sheriff Jim] Winder says. 'But whatever we've been doing here, it hasn't been hugely effective.'")

[8] *See* Ben Winslow, *Feds, Utah Leaders Launch Campaign to Educate People about Fraud Problem*, FOX13 NEWS, *available at* http://fox13now.com/2017 /04/05/feds-utah-leaders-launch-campaign-to-educate-people-about-fraud-problem.

[9] Wendy Leonard, *White Collar Crime Registry First in Nation*, DESERET MORNING NEWS, March 14, 2015.

[10] 62 S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.S.C.A.N. 3182, 3259.

reemphasized by the sentencing guidelines: "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes."[11]   The Seventh Circuit likewise emphasized the need to resist judicial leniency toward white collar criminals:

> It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.   But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.[12]

The Eleventh Circuit identified economic crime as a prime candidate for deterrence because it is "'more rational, cool, and calculated than sudden crimes of passion or opportunity.'"[13] Specifically, the cost-benefit analysis engaged in by white collar defendants is susceptible to influence through "serious punishment."[14]

This case represents the quintessential Utah fraud scheme.   Likeminded fraudsters must be deterred through an expectation of just punishment should they follow Mouritsen's footsteps. A sentence that involves actual incarceration is critical in this effort.

*4.   The need to provide restitution to any victims of the offense*:

It is highly unlikely that Mouritsen will ever be able to repay the full restitution amount due and owing to his victims.   To achieve justice for the victims in this case who will likely never be made whole, a period of incarceration is appropriate in addition to the order of restitution.   The mandatory restitution amount to be entered in this case is $2,411,463.54.   The United States

---

[11] *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).
[12] *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir.1999) (citation omitted).
[13] *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).
[14] *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

requests that the Court order the restitution payments to be made to the list of victims provided to Probation.

## IV.     RECOMMENDATION BY THE UNITED STATES

Accordingly, the United States recommends a term of incarceration of **12 months** followed by three years of supervised release.   The United States also recommends the Court order **$2,411,463.54** in restitution to be paid to the list of 13 victims provided to Probation.   Finally, the United States recommends the Court should order a restitution payment plan of at least $100 per month while the defendant is not in custody.

## V.     STATEMENT OF GOOD FAITH

As required by DUCrimR 32-1(b) the United States has conferred in good faith with opposing counsel and with the probation office in an attempt to resolve any disputed matters.

DATED this 1st day of September 2020.

JOHN W. HUBER
United States Attorney

*/s/ Jacob J. Strain*
JACOB J. STRAIN
JAMIE Z. THOMAS
Assistant United States Attorney